UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MICHAEL R. HOLMES                                    CIVIL ACTION

VERSUS                                               No. 19-12749

CORBETT REDDOCH, ET AL.                              SECTION I

## ORDER & REASONS

The plaintiff, Michael R. Holmes ("Holmes"), an attorney, was allegedly wronged by the defendants in connection with his 2018 arrest. He claims constitutional violations under 42 U.S.C. § 1983, as well as a variety of state law tort claims, arising out of that arrest against certain officers of the Plaquemines Parish Sheriff's Office ("Sheriff's Office"), namely: Corbett Reddoch ("Reddoch"), Holly Hardin ("Hardin"), Ryan Hebert ("Hebert"), Christopher Lambert ("Lambert"), and Paul Durnin ("Durnin").[1] Holmes also sued Sheriff Gerald Turlich ("Sheriff Turlich"), alleging liability under state law negligence theories and respondeat superior.[2] While Holmes sued all the officers in their individual capacities, Sheriff Turlich was sued only in his official capacity.[3]

The defendants filed the instant motion[4] for summary judgment, in which they argue that the doctrine of *Heck v. Humphrey* bars most of Holmes's claims. Alternatively, they argue that the officers are entitled to qualified immunity, and, if

---

[1] R. Doc. No. 1, at 2–3 ¶¶ 5–10.
[2] *Id.* at 3 ¶ 10; *id.* at 10 ¶¶ 49–50.
[3] *Id.* at 2–3 ¶¶ 5–10.
[4] R. Doc. No. 68.

not, Holmes has failed to sufficiently carry his burden to survive summary judgment. The Court grants the defendants' motion for the reasons below.

## I.  BACKGROUND

The facts of this case read like a law school exam.  They arise from Holmes's arrest at a church-school fair in Plaquemines Parish.  Three young girls attending the fair complained to the school's principal about a man taking pictures of them.[5] They said that the unwanted photography made them "feel uncomfortable" based on what they had learned in their "safe environment" class about interacting with strangers.[6]

A mother of one of the girls took a picture of the photographer, which was then shown to the principal.[7]  The principal took the girls to defendant Hardin, a detective in the Sheriff's Office.[8]  Hardin then asked the girls to point to the man; the girls pointed to Holmes.[9]  The principal's involvement in the matter ended at that point.[10]

---

[5] R. Doc. No. 76-2, at 17, 19 (Principal's deposition).  The girls ranged in age, but the oldest was a third-grader.  *Id.* at 17.
[6] *Id.* at 19, 23–24.
[7] *Id.* at 20–21.
[8] *Id.* at 21.
[9] *Id.*
[10] *Id.* at 42.

Reddoch approached Holmes to "investigat[e]" whether "a crime had been committed."[11]  Reddoch "asked" Holmes to provide identification.[12]  Holmes says he refused by asking "why?"[13]  Reddoch then asked Holmes to walk with him away from the crowd.[14]  Holmes initially complied, then stopped, at which point Reddoch again said, "Show me your ID."  Holmes, again, says that he only asked why.[15]

The pair differ as to how Holmes responded.  Holmes claims he was not hostile in any way to Reddoch,[16] while Reddoch claims that Holmes was "belligerent" and was using "profanities" near the children from the start.[17]  Specifically, Reddoch testified that after asking if he could "talk to [Holmes] for a second," Holmes responded, "No.  Fuck you, cop.  I'm an attorney, and that's not how it works."[18]

Reddoch later explained that, due to Holmes's behavior, he "didn't know where this was going to go" and "because things can go bad quick," he "didn't want to be next to a group of little girls if it did."[19]  So Reddoch "grabbed [Holmes] by the arm in an

---

[11] R. Doc. No. 72-2, at 16 (Reddoch's deposition).  Specifically, Reddoch sought to determine whether Holmes was "some type of a sex offender," *id.*, or otherwise "registered in any way."  *Id.* at 13.  The Court notes that, although it is immaterial, there is a matter of slight dispute as to how Reddoch found out about the children's complaints.  *Compare id.* at 3 ("I had four groups of little girls came [sic] up and tell me they had, indeed, had a problem."), *with* R. Doc. No. 76-2, at 17 (stating that the girls approached the principal).  As discussed below, the only material fact is *that* Reddoch knew of the girls' complaints, not *how* he knew.

[12] R. Doc. No. 72-2, at 15.

[13] R. Doc. No. 72-1, at 2 ¶¶ 11–12.

[14] R. Doc. No. 72-2, at 2.

[15] *Id.*

[16] R. Doc. No. 72-1, at 1 ¶ 6; *id.* at 2 ¶ 11.

[17] R. Doc. No. 72-2, at 10.

[18] *Id.* at 11–12.

[19] *Id.* at 10.

easy escort position" to lead him away from the children.[20]  Guided by Reddoch's self-described "civil" grasp, Holmes started walking away from the crowd.[21]

Things then escalated quickly—though the parties dispute how.  Reddoch testified that Holmes "violently threw his arm up into the air and pulled away."[22] (Holmes, on the other hand, swears he "was standing perfectly still.")[23]  Reddoch was mindful that Holmes had a "10-pound camera around his neck, which is a blunt force object, and [Reddoch] had no idea what was in the bag" that Holmes was wearing on his back.[24]  After Holmes raised his arm, Reddoch "didn't know if [Holmes] was going to attack," or whether "he was going for his bag."[25]  Reddoch was in "close proximity" to Holmes, and Reddoch feared "that a physical attack may be imminent."[26]  So, to protect "[his] safety and the safety of [Holmes],"[27] Reddoch used a "rollover armbar" to take Holmes to the ground.[28]

Describing the takedown, Holmes said that Reddoch "violently grabbed my arm, twisted it up behind me, swept me [sic] legs from under me, and threw me to the ground."[29]  Reddoch testified that he used the least amount of force that should

---

[20] *Id.*

[21] *Id.* at 38.  Reddoch explained this was less secure than a "compliant escort position," in which Holmes's movement would have been more limited.  *Id.* at 37–38.

[22] *Id.* at 17.  At another point in his deposition, Reddoch testified that Holmes "acted erratically by lifting his arm high into the air and pulling away from [Reddoch] while cussing."  *Id.* at 8.

[23] R. Doc. No. 72-1, at 2.

[24] R. Doc. No. 72-2, at 21.

[25] *Id.* at 17.

[26] *Id.* at 33.

[27] *Id.* at 32.

[28] *Id.* at 39.

[29] R. Doc. No. 72-1, at 2.

have been used in this situation, and this maneuver is the "minimum, quickest, safest way to get someone under control."[30]

Holmes declared that Reddoch, once they were on the ground, "kneeled into my lower back with all his weight," and the "[o]ther deputies then pinned my legs and ankles and forcefully dragged my right arm from beneath my body."[31]  He was then handcuffed,[32] and, according to Holmes, Reddoch "intentionally inflicted greater pain and injury upon me by kneeling on me with his full body weight on my low back, upper arm, and shoulder."[33]

After a search revealed Holmes's wallet and driver's license, the officers ran his name and discovered two valid, outstanding arrest warrants.[34]  Holmes was arrested for the warrants[35] and taken to the Belle Chasse lockup and held overnight.[36]  The church-school's principal asked that Holmes's car be towed from the property;[37] pursuant to Sheriff's Office policy, the officers conducted an inventory search prior to having the vehicle towed away.[38]  Holmes argues, however, that the

---

[30] R. Doc. No. 72-2, at 39.
[31] R. Doc. No. 72-1, at 2.
[32] *Id.*
[33] *Id.* at 3.
[34] R. Doc. No. 72-2, at 30.
[35] *Id.* at 8.
[36] R. Doc. No. 72-1, at 3.
[37] R. Doc. No. 76-2, at 34 (deposition of principal); *see also id.* at 55 (asking the principal whether she and the priest "ask[ed] the police to have [the officers] remove the vehicle from there," to which the principal responded, "[c]orrect").
[38] R. Doc. No. 68-3, at 12.

officers had an evidentiary purpose for the search—Hardin said that she was going to search the car to "find [Holmes's] flash drives."[39]

As a result of his struggle with the officers, Holmes was charged, *inter alia*, with resisting arrest[40] under La. Rev. Stat. § 14:108.[41]  Reddoch testified that Holmes resisted at least twice during the encounter: first while standing, "by pulling away when [Reddoch] was leading him to do an interview."[42]  And he resisted again while they were on the ground, when Reddoch "had to fight with [Holmes] to get [his arm] behind him."[43]

A state-court minute entry suggests that the resisting arrest charge was later conditionally dismissed: "On motion of the State, this matter is dismissed.  Completed informal diversionary program."[44]  Holmes disputes ever entering into such a diversionary program[45] and, importantly, maintains to this day that he "engaged in no resistance whatsoever" and "was standing perfectly still" when Reddoch took him to the ground.[46]  In short, Holmes maintains that he never resisted arrest.

Holmes's complaint alleges the following federal constitutional violations allegedly cognizable under § 1983:

---

[39] R. Doc. No. 76-1, at 106 (Holmes deposition).
[40] Although the Court colloquially refers to the offense as "resisting arrest," the crime also covers resistance given during any "lawful detention" as well.  La. Rev. Stat. § 14:108.
[41] R. Doc. No. 68-3, at 1.
[42] R. Doc. No. 72-2, at 27.
[43] *Id.* at 27.
[44] R. Doc. No. 68-5, at 1.
[45] R. Doc. No. 72-3, at 3 ¶ 16.
[46] R. Doc. No. 72-1, at 2.

> The actions of the individual defendants resulted in violations of the petitioner's civil rights, in particular, his Fourth Amendment right against unreasonable [(1)] search and [(2)] seizure as applied to the state through the Fourteenth Amendment, as well as his First Amendment right to freedom of [(3)] expression and [(4)] speech.[47]

The complaint further alleges that "[t]he actions of defendants **REDDOCH**, **LAMBERT**, and **DURNIN** in [(5)] conspiring to cover up the violations of petitioner's rights is a violation of petitioner's Fourth and Fourteenth Amendment rights."[48] According to Holmes, this federal "conspiracy" claim asserts that the defendants maliciously prosecuted Holmes in violation of the Fourth and Fourteenth Amendments.[49]

---

[47] R. Doc. No. 1, at 10 ¶ 47.

[48] *Id.* at 10 ¶ 48 (emphasis in original).

[49] After the Court's repeated requests to clarify the precise causes of action underlying the claims in his original complaint, R. Doc. Nos. 23, 45, Holmes submitted a memorandum delineating his claims. R. Doc. No. 52. Therein, Holmes listed ten separate federal constitutional claims: five claims based on Fourth Amendment violations: (a) false detention, (b) false arrest, (c) false imprisonment, (d) excessive force, (e) unreasonable search (of his person and his car); another claim based on (f) malicious prosecution in violation of the "Fifth and Fourteenth Amendment" (not the Fourth Amendment, as stated in the complaint); another claim based on (g) violation of a generalized right of privacy under *Griswold v. Connecticut*, 381 U.S. 479 (1965); two claims based on the First Amendment: (h) a violation of his right to free expression (*i.e.*, by photographing the children), and (i) a violation of his right to free speech (*i.e.*, by criticizing the officers and informing them that their conduct was illegal); and, finally, (j) a violation of Holmes's "Fifth and Fourteenth Amendment right not to be deprived of property without Due Process"—which allegedly arose out of the temporary impoundment of Holmes's personal property while he was arrested. R. Doc. No. 52.

While most of the claims delineated in the memorandum were fairly (though vaguely) presented in the complaint (*e.g.*, claims a–e, h & i), the others either contradict the constitutional theory presented in the original complaint (*e.g.*, claim f) or were completely omitted from the complaint (*e.g.*, claims g & j). Holmes has amended his complaint only once, which merely clarified the full names of officers Hardin and Lambert. R. Doc. No. 5.

As for Holmes's state law claims, the complaint alleges:

> The actions of the individual defendants in [(6)] assaulting, [(7)] battering, [(8)] falsely arresting, [(9)] detaining, [(10)] threatening, [(11)] incarcerating, [sic] humiliating petitioner are also actionable under Louisiana Law.[50]

The complaint further alleges that Sheriff Turlich is liable under a state law theory of respondeat superior for his subordinates' state law tort liability.[51]  It alleges that Turlich is separately liable for (12) "his negligence in screening, hiring, training, retraining, discipline, punishment, supervision and retraining [sic] of the individual defendant deputies.  This negligence resulted in damages to the petitioner which he sustained as a result of the assault, battery, false arrest, false imprisonment, unlawful search, and subsequent conspiracy."[52]  The complaint names Turlich only in his official capacity.[53]

The defendants filed the instant motion for summary judgment.  They argue that any claim (whether state or federal) that challenges the validity of Holmes's resisting arrest charge and conditional dismissal is barred under the doctrine of *Heck*

---

Although Holmes filed his complaints *pro se*, he is an attorney.  The Court will not allow him to continually modify his theory of the case without amending his pleadings.  Accordingly, the Court will not consider any claim that was omitted from the original or amended complaints.  *See Green v. JP Morgan Chase Bank, N.A.*, 562 F. App'x 238, 240 (5th Cir. 2014); *Park v. Direct Energy GP, L.L.C.*, 832 F. App'x 288, 295 (5th Cir. 2020) (finding that a claim omitted from the complaint "wasn't properly before the district court").  As for Holmes's malicious prosecution claim, the Court will hold Holmes to his original theory—one arising under the Fourth Amendment— since he has not amended his complaints to state any other theory.

[50] R. Doc. No. 1, at 10 ¶ 47.

[51] *Id.* at 10 ¶ 49.

[52] *Id.* at 10 ¶ 50.

[53] *Id.* at 3 ¶ 10.

*v. Humphrey*, 512 U.S. 477 (1994). Alternatively, they argue that the officers are entitled to qualified immunity on all claims—except the First Amendment claims, for which they argue Holmes has not met his summary judgment burden.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, a court determines that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. Proc. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of a material fact; it need only point out the absence of evidence supporting the other party's case. *Id.*; *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195–96 (5th Cir. 1986) ("There is no sound reason why conclusory allegations should suffice to require a trial when there is no evidence to support them even if the movant lacks contrary evidence.").

Once the party seeking summary judgment carries that burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory

allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Rather, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (citations omitted). The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue. *See Anderson*, 477 U.S. at 248. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255.

## III.   *HECK* BARS MULTIPLE CLAIMS

The defendants first argue that *Heck* bars Holmes's claims for false detention, arrest, and imprisonment, as well as his excessive force claim. Holmes initially responds that the defendants should not be allowed to rely on a *Heck* defense because they failed to include it in their answer.[54] Holmes is wrong: "A *Heck* defense . . . is not waived by failure to plead it as an affirmative defense and can be brought by motion at trial." *Walker v. Munsell*, 281 F. App'x 388, 389 (5th Cir. 2008); *see also*

---

[54] R. Doc. No. 72, at 2.

*Watson v. New Orleans City*, 275 F.3d 46, 2001 WL 1268716, at *3 (5th Cir. 2001) (per curiam) (noting that "waivers of defenses based on grounds rooted in considerations of state sovereignty are applied less harshly than other waivers") (citing *Graham v. Johnson*, 94 F.3d 958, 970 (5th Cir. 1996) (per curiam)).  Therefore, the Court may consider the defendants' *Heck* defense.

### A.    Overview of *Heck*

*Heck* bars the litigation of a § 1983 claim if success on that claim "would necessarily imply that a prior conviction or sentence is invalid." *Aucoin v. Cupil*, 958 F.3d 379, 382 (5th Cir. 2020) (citing *Heck*, 512 U.S. at 486–87).  The rationale is that "civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments." *Heck*, 512 U.S. at 485–86.  That is because "courts are wary of duplicative litigation and the potential for conflicting judgments." *Aucoin*, 958 F.3d at 382.

However, where the "'plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff,' the claim implicates none of these concerns and may therefore proceed." *Id.* (quoting *Heck*, 512 U.S. at 487).  The court asks whether "success on the . . . claim requires negation of an element of the criminal offense or proof of a fact that is inherently inconsistent with one underlying the criminal conviction." *Id.* (quoting *Bush v. Strain*, 513 F.3d 492, 497 (5th Cir. 2008)).  Another hallmark of a non-*Heck*-barred claim is "if the factual basis for the conviction is temporally and conceptually distinct" from the civil claim. *Bush*, 513 F.3d at 498.

But the *Heck* bar extends further: even where the plaintiff's "*factual allegations* supporting the claim are necessarily inconsistent with the validity of the conviction," *Heck* still bars the claim. *Aucoin*, 958 F.3d at 383 (citing *Bush*, 513 F.3d at 497; *DeLeon v. City of Corpus Christi*, 488 F.3d 649, 656–57 (5th Cir. 2007)). That is true regardless of a civil claim's "theoretical compatibility" with the criminal conviction. *Daigre v. City of Waveland*, 549 F. App'x 283, 286 (5th Cir. 2013) (quoting *Bush*, 513 F.3d at 498 n.14); *see also Thomas v. Pohlmann*, 681 F. App'x 401, 407 (5th Cir. 2017) (citing with approval *Daigre* and *DeLeon*).

To lift the *Heck* bar, the plaintiff must show that the prior criminal proceeding terminated in his favor—*i.e.*, "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck*, 512 U.S. at 487. The plaintiff has the burden to prove that the criminal proceedings terminated in his favor. *Hoog-Watson v. Guadalupe Cty.*, 591 F.3d 431, 435 (5th Cir. 2009). Absent such a showing, a *Heck*-barred claim should be "dismissed with prejudice to [its] being asserted again until the *Heck* conditions are met." *DeLeon*, 488 F.3d at 657 (quoting *Johnson v. McElveen*, 101 F.3d 423, 424 (5th Cir.1996)).

### B.    Pretrial Diversion Is Not Favorable Termination

The defendants first argue that Holmes's resisting arrest charge—which was dismissed following Holmes's completion of an "informal diversionary program"[55]— did not terminate in his favor as required by *Heck*. Based on the "high standard" set

---

[55] R. Doc. No. 68-5, at 1.

by the Fifth Circuit for favorable termination (first for malicious prosecution cases, then for *Heck* cases), this Court must agree.  *Evans v. Ball,* 168 F.3d 856, 859 (5th Cir. 1999), *abrogated on other grounds by Castellano v. Fragozo*, 352 F.3d 939, 948 (5th Cir. 2003).  In *Evans*, the Fifth Circuit rejected a malicious prosecution plaintiff's argument that "favorable termination results when the disposition fails to indicate that the accused is guilty."  *Id.*  Instead, the court held the exact opposite: "proceedings terminate in favor of the accused only when they *affirmatively indicate that he is not guilty.*"  *Id.* (emphasis added).

Generally, *Heck* applies to pretrial diversion programs because such programs do not affirmatively indicate innocence:

> A div[er]sion program is essentially a middle ground between conviction and exoneration. *Gilles v. Davis*, 427 F.3d 197, 211 (3d Cir. 2005) (explaining the procedure as a 'compromise' because although there is not [a] guilty plea, a diversion imposes burdens on the defendants 'not consistent with innocence'). Even though it is not a guilty plea, defendants entering diversion programs '*acknowledge responsibility for their actions.*' *Taylor v. Gregg*, 36 F.3d 453, 455 (5th Cir. 1994) *overruled on other grounds by Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003) (en banc). As such, '[e]ntering a pre-trial diversion agreement does not terminate the criminal action in favor of the criminal defendant....' *Id.* at 456.

*Morris v. Mekdessie*, 768 F. App'x 299, 301 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 870 (2020) (emphasis added).

More specifically applicable here, the Louisiana Supreme Court, when answering a question certified by the Fifth Circuit, explained that *conditional* dismissal of a prosecution does not imply favorable termination: "dismissal of a criminal prosecution pursuant to La.C.Cr.P. art. 691 will constitute a bona fide

13

termination in favor of the . . . plaintiff *unless* the charge is dismissed *pursuant to an agreement of compromise*." *Lemoine v. Wolfe,* 168 So. 3d 362, 364 (La. 2015) (emphasis added). Therefore, when a charge is dismissed pursuant to an agreement of compromise, it does *not* terminate in the plaintiff's favor.

Here, according to the state-court minute entry, that is exactly what happened: Holmes's criminal charge for "resisting an officer" was dismissed following his completing an "informal diversionary program."[56] Completing such a program was "an agreement of compromise" that conditionally dismissed the resisting arrest charge against him. *Id.*[57] Accordingly, Holmes's completion of a pretrial diversionary program shows that his criminal charge did not terminate in his favor. Therefore, any claim that questions the validity of those proceedings is barred by *Heck*.

Holmes disagrees, arguing that (1) his resisting arrest charge resulted in a *nolle prosequi—i.e.,* a discretionary and unconditional abandonment of the prosecution by the state, *see Nolle prosequi, Black's Law Dictionary* (9th ed. 2009)— which does not imply guilt, and (2) he never agreed to a diversion program or waive suit against the officers.

As for the first argument: Holmes, other than alleging that this was a *nolle prosequi,* cites nothing in the state-court record to contradict the plain language of

---

[56] R. Doc. No. 68-5, at 1.

[57] Emails attached by both Holmes and the defendants indicate that the prosecution was dismissed as a condition not only of diversion, but also of Holmes's agreement to waive suit against the officers. R. Doc. No. 68-6, at 1; R. Doc. No. 72-1, at 9–10.

the state-court minute entry, which must be presumed[58] as true: "On motion of the State, this matter is dismissed.  Completed informal diversionary program."[59]  If it was a *nolle prosequi*—again, an unconditional dismissal not implying guilt—there would be no reason to note that Holmes "[c]ompleted [an] informal diversionary program."[60]  That such program was noted indicates this was a *conditional* dismissal acknowledging Holmes's responsibility, the very type considered in *Evans*, *Taylor*, and *Morris*.  But regardless of whether Holmes completed a diversionary program, the minute entry does not "affirmatively indicate" Holmes's innocence, which is all that matters for purposes of determining whether it terminated in his favor.  *See Evans*, 168 F.3d at 859; *Taylor*, 36 F.3d at 456.

As for the second: as evidence that he never agreed to diversion, Holmes cites his own declaration,[61] an unauthenticated letter from his first attorney, dated

---

[58] A state court's "minute entry, executed by a sworn public official in the discharge of his duties, is entitled to a presumption of regularity." *Walker v. Maggio*, 738 F.2d 714, 717 (5th Cir. 1984).  "The district court could properly rely upon the regularity of the state court's documents in preference to [the habeas petitioner's] own self-serving testimony." *Thompson v. Estelle*, 642 F.2d 996, 998 (5th Cir. 1981); *see also United States v. Marcello*, 210 F. Supp. 892, 895 (E.D. La. 1962) (reasoning that the petitioner, who challenged the accuracy of a federal-court minute entry, "has a severe burden of proof in this case to rebut if he can the strong presumption of regularity of judicial proceedings and judgments rendered therein"), *aff'd*, 328 F.2d 961 (5th Cir. 1964); *see also Parke v. Raley*, 506 U.S. 20, 29 (1992) (recognizing, "even when the question is waiver of constitutional rights," "the 'presumption of regularity' that attaches to final judgments" (citation omitted)).  "Official records are entitled to a presumption of regularity. . . . The same special reliability that warrants relaxing the hearsay rule as to these records also warrants according them great evidentiary weight." *Webster v. Estelle*, 505 F.2d 926, 929–30 (5th Cir. 1974).

[59] R. Doc. No. 68-5, at 1.

[60] *Id.*

[61] R. Doc. No. 72-1.

roughly five months prior to when the charge was dismissed, and unauthenticated emails between his second attorney and the District Attorney (which the defendants also attached to their motion).[62]   The letter indicates that Holmes, at least at the time it was written, did not want to agree to diversion or settlement (contrary to his first attorney's advice, which sought to preserve Holmes's bar membership).[63]

But Holmes's mind obviously could have changed in the intervening five months.  It is therefore entirely possible that Holmes later agreed to diversion—which is exactly what the competent summary judgment evidence here (the minute entry) indicates.  Indeed, even Holmes's most timely evidence indicates that his attorney understood that Holmes had an "agreement with the District Attorney's Office."[64] Holmes has the burden under *Heck*;[65] a single self-serving declaration and unauthenticated, somewhat equivocal, communications are not enough to genuinely dispute the validity of a court record that is clear on its face.  *See Evans*, 168 F.3d at 860 (requiring that "the disposition of the case . . . affirmatively indicate that [the

---

[62] *Id.* at 7–10.  The defendants also attach an additional email from the assistant district attorney to the defendants' attorney, which confirms that the prosecution dismissed the charge only as a condition to diversion.  R. Doc. No. 68-6, at 1–2 ("I guess I [(the assistant district attorney)] was wrong to expect Holmes to honor his word as an officer of the court. His attorney understood that it was part of the agreement to close the case without adversely impacting the arrestee's bar membership.").

[63] R. Doc. No. 72-1, at 7.

[64] *Id.* at 9 ("As we have discussed at length, the agreement with the District Attorney's Office to dismiss your case is contingent upon you not filing a civil suit against the Plaquemines Parish Sheriff's Office.").   That email was sent after the attorney learned that Holmes had filed the instant lawsuit, violating that agreement.  *Id.*

[65] *Heck*, 512 U.S. at 486–87 ("[A] § 1983 plaintiff *must prove* that the conviction or sentence has been reversed on direct appeal, [or otherwise terminated in his favor.]" (emphasis added)).

plaintiff] was not guilty").  Instead, this Court is entitled to "rely upon the regularity of the state court's documents in preference to [Holmes's] own self-serving testimony." *Thompson*, 642 F.2d at 998.[66]

Perhaps more importantly, Holmes provides no evidence showing (nor does he even allege) that he has attempted to challenge the record in state court.  That is telling.  Although the parties do not address this, it appears that Louisiana allows for expungement of misdemeanor arrest and charge records that were not prosecuted "for any reason . . . including the reason that the person successfully completed a pretrial diversion program."  La. Code. Crim. Proc. art. 976(A)(2).[67]

All told, Holmes has failed to carry his burden to create a genuine dispute of fact, and produce sufficient evidence to support, his claim that the resisting arrest

---

[66] This case is therefore distinguishable from *Magee*, in which the plaintiff "submitted declarations from his criminal counsel, . . . from his aunt, . . . and from himself" to question the validity of the court record.  *Magee v. Reed*, 912 F.3d 820, 823 (5th Cir. 2019).  Holmes has provided only one declaration—his own—not even one from his first attorney.

[67] The expungement statute provides in relevant part:

> A. A person may file a motion to expunge a record of his arrest for a felony or misdemeanor offense that did not result in a conviction if any of the following apply:
>> (1) The person was not prosecuted for the offense for which he was arrested, and the limitations on the institution of prosecution have barred the prosecution for that offense.
>> (2) The district attorney for any reason declined to prosecute any offense arising out of that arrest, including the reason that the person successfully completed a pretrial diversion program.

La. Code Crim. Proc. art. 976; *see also State v. M.K.O.*, 833 So. 2d 1265, 1267 (La. Ct. App. 2d Cir. 2002) (holding that plaintiff, whose felony charges were dismissed following pretrial diversion, was entitled to expungement).

charge terminated in his favor; the Court will therefore treat it as a conviction for purposes of *Heck*.[68]

### C.    Application & Analysis

Holmes's resisting arrest conviction did not terminate in his favor, so the Court must ask whether success on his § 1983 claims would necessarily imply the invalidity of that conviction.  It analyzes each claim in turn.

*1.*    Heck *Bars Holmes's False Arrest, False Imprisonment[69]*

*Unreasonable Search, and First Amendment Retaliation Claims*

The Court first considers Holmes's false arrest and imprisonment claims.  As one might expect, to succeed on these claims, Holmes must prove the falsity of the arrest and imprisonment—*i.e.*, that his liberty of movement was illegally impaired owing to lack of reasonable suspicion or probable cause.  *Brown v. Lyford,* 243 F.3d 185, 189 (5th Cir. 2001) ("The 'constitutional torts' of false arrest . . . and false imprisonment . . . require a showing of no probable cause.").

But to do so would necessarily imply the invalidity of his resisting arrest conviction—because a resisting arrest conviction is valid only if the arrestee resisted a "lawful" arrest or detention.  *See* La. Rev. Stat. § 14:108; *Kokesh v. Curlee*, 422 F.

---

[68] Because a non-favorable termination is equivalent to a conviction for purposes of *Heck*, the Court will describe it as a "conviction" rather than the more cumbersome alternatives (*e.g.*, "non-favorable termination" or "resisting arrest charge and conditional dismissal").

[69] Holmes alleges a "false detention" claim as well, R. Doc. No. 52, at 3, but the Court treats it the same as his false imprisonment claim for purposes of the *Heck* analysis. Both claims require proving a lack of the requisite quantum of suspicion (*i.e.*, reasonable suspicion or probable cause).

Supp. 3d 1124, 1134 (E.D. La. 2019) (Lemmon, J.) ("[S]ection 108 applies only to instances where a *lawful* arrest or detention is being made." (emphasis in original)); *State v. Siggers*, 490 So. 2d 716, 721 (La. Ct. App. 2d Cir. 1986) ("A person is required to submit peaceably to a *lawful* arrest." (emphasis in original)).  An arrest without probable cause or exigencies would not be lawful.  His resisting arrest conviction, therefore, rested on a finding that the underlying arrest or detention was lawful (*i.e.*, supported by the requisite quantum of suspicion).  The same goes for Holmes's overnight imprisonment following his being arrested on the outstanding warrants and charged for resisting arrest.

Because Holmes's false arrest and imprisonment claims, if proven, would necessarily imply the invalidity of his resisting arrest conviction, they are barred by *Heck.  Wells v. Bonner*, 45 F.3d 90, 95 (5th Cir. 1995) (finding the plaintiff's resisting-a-search conviction barred his § 1983 unlawful-arrest claim under *Heck*); *Arnold v. Town of Slaughter*, 100 F. App'x 321, 325 (5th Cir. 2004) (affirming the dismissal of § 1983 false arrest claims as *Heck*-barred where those claims' success required proof of an invalid arrest, which would imply the invalidity of the plaintiff's resisting arrest conviction under La. Rev. Stat. § 14:108); *see also Heck*, 512 U.S. at 486 n.6 (hypothesizing that a § 1983 false arrest claim would necessarily imply the invalidity of a generic resisting arrest conviction).

Under this same logic, Holmes's unreasonable search and First Amendment retaliation claims are also *Heck*-barred.  The search claim is based on Hardin's search

of Holmes's wallet after Reddoch took him to the ground.[70]  Attempting to defend that claim against summary judgment, Holmes is adamant that he "has always contended that no probable cause existed at the time he was placed in an arm bar and slammed to the ground. . . .  Therefore, any purported search incident to the *unlawful arrest* was unlawful."[71]  Once again, Holmes's theory rests on the assumption that his arrest was unlawful; it is therefore *Heck*-barred.  The same is true for Holmes's First Amendment retaliation claim, which asserts that Holmes's arrest was simply retaliation against his exercising a First Amendment right to take photographs.  Such a claim requires Holmes to "plead and prove the absence of probable cause for the arrest."  *Magee v. Reed*, No. 14-1554, 2021 WL 411449, at \*5 (E.D. La. Feb. 5, 2021) (Milazzo, J.) (quoting *Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019)).  Doing so would imply the invalidity of his resisting arrest conviction—so the retaliation claim is also *Heck*-barred.  *Id.*

2.      Heck *Bars Holmes's Fourth Amendment Malicious Prosecution Claim*

Holmes alleges a malicious prosecution claim against Reddoch, which is based on a Fourth Amendment theory because, Holmes says, he was "seized and arrested" by Reddoch "without probable cause."[72]  The defendants argue this is not a cognizable

---

[70] *Id.* at 5.

[71] R. Doc. No. 96, at 10, 11 (emphasis added).  The search of the wallet revealed Holmes's identification, and a database search of his name revealed the two outstanding warrants, including a "fugitive warrant" issued in 2016, for which Holmes was arrested.  R. Doc. No. 68-4, at 2; *see also supra* notes 34, 36 and accompanying text.

[72] R. Doc. No. 72, at 24 (quoting *Castellano*, 352 F.3d at 953).  The Court questions how this claim would differ from Holmes's false arrest and imprisonment claims.  *See Wallace v. Kato*, 549 U.S. 384, 389–90 (2007).

claim in the Fifth Circuit.[73]  They are clearly wrong: the Fifth Circuit has held that there is "no freestanding right under the Constitution to be free from malicious prosecution," but "facts amounting to malicious prosecution are properly alleged as part of an actual Fourth Amendment claim, such as unreasonable search or seizure." *Arnold v. Williams*, 979 F.3d 262, 270 (5th Cir. 2020) (citing *Morgan v. Chapman*, 969 F.3d 238, 246 (5th Cir. 2020)).

The Court need go no further, however, because success on this claim—like those above—would imply the invalidity of Holmes's resisting arrest conviction. Holmes's malicious prosecution theory rests on an alleged violation of the Fourth Amendment (*i.e.*, that he was unconstitutionally seized and arrested due to lack of probable cause);[74] it requires a showing of no probable cause—just like the *Heck*-barred claims discussed above.  Therefore, to the extent Holmes's malicious prosecution claim is independent from the others that challenge the validity of his arrest, it is also *Heck*-barred.

### 3.  Heck *Bars Holmes's Excessive Force Claim*

Intuition suggests that Holmes's excessive force claim would not be *Heck*-barred by his resisting arrest conviction; one might suppose that success of the former would not *necessarily* imply the invalidity of the latter.  For example, even if an arrestee wrongly resists an arrest, an officer could still be found to have used an

---

[73] R. Doc. No. 76, at 9 ("[T]he Fifth Circuit in *Castellano* . . . conclusively held that there exists no claim for 'malicious prosecution' under the Fourth Amendment.").

[74] *See* R. Doc. No. 72, at 24–25 (explaining his claim is based on "[t]he initiation of criminal charges without probable cause").

unconstitutional (*i.e.*, objectively unreasonable) amount of force to complete the arrest.  Such a finding would not imply the invalidity of the conviction itself.  *See, e.g.*, *Bush*, 513 F.3d at 498 (concluding excessive force claim was not *Heck*-barred because it was temporally and conceptually distinct from the facts underlying the resisting arrest conviction).

However, the Fifth Circuit takes a wider tack—it applies *Heck* to bar claims based on underlying factual *allegations* if they necessarily contradict facts supporting the criminal conviction.  It has explained that "a plaintiff's claim is *Heck*-barred *despite its theoretical compatibility* with his underlying conviction if specific factual allegations in the complaint are *necessarily inconsistent* with the validity of the conviction."  *Daigre*, 549 F. App'x at 286 (quoting *Bush*, 513 F.3d at 498 n.14) (emphasis added) (internal quotation marks omitted).  This is so, the court has explained, "because 'factual assertions in pleadings are judicial admissions *conclusively* binding on the party that made them.'"  *Id.* (quoting *Davis v. A.G. Edwards & Sons, Inc.*, 823 F.2d 105, 108 (5th Cir. 1987)).

For example, a plaintiff's excessive force allegation that she "[a]t no time . . . physically resist[ed] or assault[ed] the Defendant Officers in any way, and the force used against her was unnecessary, unreasonable and excessive," necessarily conflicted with the facts underlying her resisting arrest conviction—that she had resisted the officers in *some* way.  *Id.* at 286–87.  Because those allegations would necessarily "contradict [her] admission of guilt" for resisting arrest, her excessive force claim was *Heck*-barred.  *Id.*; *see also DeLeon*, 488 F.3d at 656–57 (finding that

the plaintiff's excessive force claims were barred by his aggravated assault conviction because that claim alleged he was wholly innocent and wrongfully attacked by the officers); *Terrell v. Pichon*, 795 F. App'x 935, 937 (5th Cir. 2020) (holding that a Louisiana resisting arrest conviction barred plaintiff's excessive force claim, in which plaintiff "allege[d] that [the officer] used force even though [the plaintiff] did not resist arrest"); *Arnold*, 100 F. App'x at 324 (holding that an excessive force claim was *Heck*-barred where plaintiff "claim[ed] that he did nothing wrong, but was viciously attacked for no reason").

Holmes's factual allegations are that (1) he did nothing wrong,[75] and (2) Reddoch attacked him after he placidly refused to provide his identification, asking "[w]hy."[76] According to Holmes, then, "no force was justified"[77]—since he did not even slightly resist. But that would of course undermine his *resisting* arrest conviction, which necessarily found that Holmes resisted. In other words, Holmes's allegations are just like those in *Daigre*, *DeLeon*, *Terrell*, and *Arnold*—he "still thinks he's innocent." *DeLeon*, 488 F.3d at 657. Therefore, his excessive force claim is barred by *Heck*.

---

[75] "Petitioner did not make any threatening or other movements, but to the contrary stood perfectly still in order that no threat could be perceived. Upon being assaulted, petitioner fell to his knees a [sic] quickly as possible, offering no resistance whatsoever." R. Doc. No. 1, at 4 ¶ 14 (Complaint).

[76] "Upon being approached by defendant **REDDOCH** with a demand to produce identification, petitioner calmly asked, 'Why?'. After a second such demand and second similar response, defendant **REDDOCH**, without further inquiry, explanation, or warning, suddenly and violently assaulted and battered petitioner, employing a 'roll over arm bar takedown', arresting and injuring petitioner." *Id.* at 3 ¶ 12 (emphasis in original).

[77] R. Doc. No. 72, at 21 (Holmes's opposition).

Holmes claims this is not so because his excessive force allegations would not necessarily undermine his resisting arrest conviction.[78]  But other than reciting the general rule from his principal case, *Bush*, Holmes cites no case negating the principle described above—that factual allegations in a complaint, where necessarily inconsistent with facts supporting a criminal conviction, are enough to render a claim *Heck*-barred.  Indeed, even *Bush* recognized that "if specific factual allegations in the complaint are necessarily inconsistent with the validity of the conviction," the civil claim is *Heck*-barred.  *Bush*, 513 F.3d at 498 n.14 (quoting *McCann v. Neilsen*, 466 F.3d 619, 621 (7th Cir. 2006)); *see also McCann*, 466 F.3d at 622 (holding that the district court erred by finding that the plaintiff pleaded facts contradicting his conviction, but accepting the legal premise that factual allegations can trigger the *Heck* bar); *Aucoin*, 958 F.3d at 383 (same).

At bottom, Holmes maintains a single theory: that he was peaceful and never resisted, was attacked out of nowhere, and such attack was therefore excessive.[79]  Holmes's recitation of his declaration—the only source his opposition memoranda

---

[78] *Id.* at 8 (citing *Bush*, 513 F.3d at 498).

[79] R. Doc. No. 1, at 3–4 ¶¶ 13, 14 (Complaint) ("[A]t no time did petitioner utter any word or sound in response other than to reasonably ask 'Why?'" "Petitioner did not make any threatening or other movements, but to the contrary stood perfectly still in order that no threat could be perceived.  Upon being assaulted, petitioner fell to his knees a [sic] quickly as possible, offering no resistance whatsoever."); R. Doc. No. 76-1, at 85 (Holmes's deposition) ("I asked very calmly why.  There was no shouting.  There was no movement.  I stood perfectly still so that he could not perceive any threat.").

cites for his side of the story—admits no more.[80]  He therefore fails to "provide[]" an "alternative pleading or theory of recovery" that does not imply the invalidity of his resisting arrest conviction.  *DeLeon*, 488 F.3d at 657 (quoting *Arnold*, 100 F. App'x at 324).  Without such a concession, his claim must be *Heck*-barred because he "insist[s] . . . that he is wholly blameless for the use of force against him."  *Aucoin*, 958 F.3d at 383.  Consequently, Holmes's excessive force claim is barred by *Heck*.

## IV.   QUALIFIED IMMUNITY

That leaves four of Holmes's federal claims: his Fourth Amendment claims based on the search of his (1) person and (2) vehicle, and (3) two interrelated First Amendment claims.  The defendants argue they are entitled to qualified immunity on all four claims.  The Court agrees.

### A.   Legal Standard

Qualified immunity "protect[s] police officers from the sometimes hazy border between excessive and acceptable force."  *Saucier v. Katz*, 533 U.S. 194, 206 (2001) (citation omitted).  "Qualified immunity changes the nature of the summary-judgment burden, how and when the burden shifts, and what it takes to satisfy the burden."  *Joseph ex rel. Joseph v. Bartlett*, 981 F.3d 319, 329 (5th Cir. 2020).

When a defendant makes a "'good-faith assertion of qualified immunity,' that 'alters the usual summary-judgment burden of proof, shifting it to the plaintiff to show that the defense is not available.'"  *Id.* at 329–30 (quoting *Orr v. Copeland*, 844

---

[80] R. Doc. No. 72, at 8–10; R. Doc. No. 72-1, at 2 ¶¶ 12, 13 (Holmes's declaration) (stating "I had engaged in no resistance whatsoever" and "I was standing perfectly still at the time Reddoch attacked me").

F.3d 484, 490 (5th Cir. 2016)).  Then, "to overcome qualified immunity," the plaintiff must show a version of "disputed facts" that "constitute a violation of clearly established law.  This requires the plaintiff to 'identify a case'—usually, a 'body of relevant case law'—in which 'an officer acting under similar circumstances . . . was held to have violated the [Constitution].'"  *Id.* at 330 (quoting *District of Columbia v. Wesby*, __ U.S. __, 138 S. Ct. 577, 590 (2018)).  Ultimately, to carry its burden, the plaintiff must show that the "unlawfulness of the challenged conduct [is] beyond debate."  *Id.* (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)).

To decide whether to grant summary judgment on the basis of qualified immunity, a court "view[s] the facts in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in its favor."  *Id.* (quoting *Deville v. Marcantel*, 567 F.3d 156, 164 (2009) (per curiam)).   A court "then determin[es] whether the plaintiff can prove" (1) "a constitutional violation" (2) "that was clearly established" at the time of the alleged violation, *id.*, which is satisfied only if "every reasonable official would understand that what he is doing violates [the law]."  *Turner v. Lieutenant Driver*, 848 F.3d 678, 691 (5th Cir. 2017) (quoting *al–Kidd*, 563 U.S. at 741).

## B.    Search of Holmes's Vehicle

Holmes alleges that the "defendants" (Holmes is unclear exactly who, but he names at least Hardin) violated his Fourth Amendment rights when they conducted an inventory search of his vehicle prior to towing it from the school's parking lot.[81]

---

[81] R. Doc. No. 52, at 6; R. Doc. No. 96, at 11–12.

To recap: once Holmes was arrested by the officers on the two outstanding warrants, the church-school's principal told the officers that, "if [Holmes] was not going to be on the property, the car needed to leave, too."[82]  The principal later explained that the church has "had issues in the past when we go to do carpool in the morning and people leave their cars, especially after the fair, we don't have the proper traffic flow."[83]  The officers abided, towing the car away to the impound.  Before doing so, however, they conducted what they describe as an "inventory search to protect the contents of [Holmes's] vehicle prior to impoundment."[84]

Hence, the defendants argue that neither the seizure of the car nor the search required a warrant—the car's impoundment was permissible under the community caretaker exception, and the search was permissible under the inventory search exception.[85]  Even if not, the defendants contend they are entitled to qualified immunity.[86]  Holmes alleges that the "inventory" rationale was pretextual—he claims Officer Hardin said to him that she was going to search the car to "find [Holmes's] flash drives."[87]  He loses under clearly established law.

---

[82] R. Doc. No. 76-2, at 34 (deposition of principal); *see also id.* at 55 (asking the principal whether she and the priest "ask[ed] the police to have [the officers] remove the vehicle from there," to which the principal responded, "[c]orrect").
[83] *Id.* at 34.
[84] R. Doc. No. 95, at 15.
[85] *Id.* at 13, 15 (citing *United States v. Staller*, 616 F.2d 1284, 1290 (5th Cir. 1980) ("[I]f an inventory search is otherwise reasonable, its validity is not vitiated by a police officer's suspicion that contraband or other evidence may be found.")).
[86] *Id.* at 16.
[87] R. Doc. No. 76-1, at 106 (Holmes deposition).

At the outset, Holmes has a point (at least partially): it has been well-settled for decades that "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *United States v. McKinnon*, 681 F.3d 203, 209 (5th Cir. 2012) (quoting *Florida v. Wells*, 495 U.S. 1, 4 (1990)).  Accordingly, to prevent reasonable inventory searches from becoming unreasonable, such searches must be "conducted pursuant to standardized regulations and procedures that are consistent with (1) protecting the property of the vehicle's owner, (2) protecting the police against claims or disputes over lost or stolen property, and (3) protecting the police from danger." *Id.* (quoting *United States v. Lage*, 183 F.3d 374, 380 (5th Cir. 1999)).  The purpose of such policies is to "sufficiently limit the discretion of law enforcement" so as to prevent the warrant exception from swallowing the rule. *Id.* (quoting *United States v. Andrews*, 22 F.3d 1328, 1336 (5th Cir. 1994)).[88]

However, it is equally well-settled that the "reasonableness inquiry under the Fourth Amendment is an objective one, wholly divorced from the subjective beliefs of police officers. [S]o long as police do no more than they are objectively authorized and legally permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry." *Id.* at 210 (quoting *United States v. Castro,* 166 F.3d 728, 734 (5th Cir. 1999) (en banc); citing *Wren v. United States*, 517 U.S. 806, 813 (1996)).  Because the reasonableness test is objective, any officer's subjective motivation for a search or

---

[88] That said, the Fifth Circuit has held that an inventory-search policy was not overly broad even though it required an officer to search "[w]henever an officer authorizes a nonconsent tow of a prisoner's vehicle." *McKinnon*, 681 F.3d at 210 (quoting the police department's policy).

seizure is simply immaterial to the Fourth Amendment inquiry. *See Whren*, 517 U.S. at 813 (rejecting Fourth Amendment challenge to traffic stop allegedly based on race). Not surprisingly, therefore, the Fifth Circuit has previously rejected this sort of argument. *McKinnon*, 681 F.3d at 210 (concluding that "[a]lthough [the officer] may have had an ulterior motive to search the vehicle, the inventory search was reasonable, and thus, remained valid under the Fourth Amendment").

Therefore, Holmes's reliance on Hardin's alleged intention to search the car for evidence is not, by itself, enough to transform an otherwise reasonable inventory search into an unconstitutional one. And Holmes offers no other evidence to question the validity of the inventory search.[89] The defendants, moving for summary judgment, have carried their burden to point to the absence of a material factual dispute—all agree that a search of the car occurred prior to its being towed from the parking lot. Holmes, on the other hand, has not carried his burden to show that a genuine dispute of material fact exists as to whether this search deviated materially from the Sheriff's Office's inventory-search policy. On this record, therefore, the Court cannot conclude that Holmes's "version of disputed facts" states a constitutional violation in the first place. *Joseph*, 981 F.3d at 330. Consequently, Hardin (and any other defendant who searched Holmes's vehicle) are entitled to qualified immunity because Holmes has failed to state a constitutional violation.

---

[89] *See* R. Doc. No. 96, at 11–12 (failing to provide a *single* record citation to support any factual assertion made therein).

But even if the Court assumes that Holmes has stated a Fourth Amendment violation, the defendants would still be entitled to qualified immunity because that violation was not clearly established.  The defendants' assertion of qualified immunity shifts the burden to Holmes to "'identify a case' . . . in which 'an officer acting under similar circumstances . . . was held to have violated the [Constitution].'"  *Joseph*, 981 F.3d at 330 (quoting *Wesby*, 138 S. Ct. at 590).  Holmes has not carried his burden—not even close.  After the Court ordered supplemental briefing on this claim (and the others below), Holmes submitted a 23-page memorandum that contained a grand total of *four* case citations (and two of those sought to assure the Court of the proper summary-judgment standard).[90]  He did not cite to a single case supporting his argument that the defendants' search of his vehicle violated law that was clearly established in 2018.[91]  Therefore, Hardin (and any other defendant who searched Holmes's vehicle) are entitled to qualified immunity on this basis as well.

### C.    Search of Holmes's Person

Holmes also claims that the officers (particularly, Hardin and Reddoch) violated his Fourth Amendment rights by searching his person and wallet after taking him to the ground; the officers then retrieved Holmes's driver's license.  A database search of the license revealed two outstanding warrants, for which Holmes was arrested.  The Court has concluded above that this claim is *Heck* barred, since its factual allegations imply that at no point was there probable cause for his arrest.

---

[90] *See* R. Doc. No. 96, at 2 (citing *Tolan v. Cotton*, 572 U.S. 650 (2014) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).
[91] *Id.* at 11–12 (citing no cases).

However, for the sake of completeness, the Court concludes in the alternative that the officers are entitled to qualified immunity.

Assuming this was a constitutional violation,[92] it was not clearly established at the time of Holmes's arrest.  For example, the Fifth Circuit has noted—in an opinion decided a month after Holmes's arrest—that it was not a clearly established Fourth Amendment violation for an officer to conduct a "search of [the arrestee's] person and search of his wallet." *Emesowum v. Cruz*, 756 F. App'x 374, 381 n.3 (5th Cir. 2018) (citing *United States v. Vickers*, 540 F.3d 356, 362–63 (5th Cir. 2008)). "[A]n officer may check an individual's identification in his wallet during a *Terry* stop." *Id.* (quoting *United States v. Brown*, 366 F.3d 456, 461 (7th Cir. 2004)).

Holmes, again, has not identified a *single* case supporting his allegation that the search of his wallet was unconstitutional.[93]  Accordingly, Holmes has failed to meet his burden; the officers (Reddoch, Hardin, and any other who searched Holmes's person) are entitled to qualified immunity.

### D.     First Amendment Claims

Holmes claims his First Amendment rights were violated because he had a right to express himself through photography, for which Reddoch retaliated by

---

[92] To the extent Holmes is arguing that the officers were required to first ask for Holmes's *name*—rather than his identification—that is not compelled by the Fourth Amendment.  The "reasonableness of the officer's decision to stop [or search] a suspect does not turn on the availability of less intrusive investigatory techniques." *United States v. Vickers*, 540 F.3d 356, 362 (5th Cir. 2008) (quoting *United States v. Sokolow,* 490 U.S. 1, 11 (1989)).

[93] R. Doc. No. 96, at 9–11 (citing no cases).

arresting him.[94]  In an earlier Court-ordered memorandum delineating his claims, Holmes invoked *Turner*—in which the Fifth Circuit held that "a First Amendment right to record *the police* does exist," 848 F.3d at 688 (emphasis added)—to argue that his photography of children was constitutionally protected.[95]  Holmes proceeds from that premise to conclude that Reddoch's detention and arrest were invalid retaliation for Holmes's protected photography.[96]  He further cursorily asserts that his "First Amendment claims also relate to his freedom of speech . . . .  For example, when the handcuffed Plaintiff informed defendants that they had accomplished an unlawful arrest, defendant Hebert responded by placing his clenched fist up to Plaintiff's face."[97]

The defendants, although their briefing could be more direct, assert qualified immunity for Holmes's First Amendment claims, should those claims survive *Heck*.[98] The defendants also argue that Holmes has failed to state and support a First Amendment claim sufficient to survive summary judgment.[99]  However, because the

---

[94] *Id.* at 2–9.

[95] R. Doc. No. 52, at 7.

[96] R. Doc. No. 96, at 7–8.

[97] *Id.* at 9.  This appears to be based on Holmes's declaration.  *See* R. Doc. No. 72-1, at 3 ¶ 21 ("Hebert held his clenched fist up to my face and said do you want us to take the handcuffs off you and we will 'settle this right now.'").  Holmes claimed that he "feared that Hebert was about to punch me and so did not respond."  *Id.* at 3 ¶ 22.

[98] R. Doc. No. 95, at 4 (quoting *Roy v. City of Monroe*, 950 F.3d 245 (5th Cir. 2020)). Moreover, the defendants asserted qualified immunity in their answer against all claims, which makes it clear that their citations to cases finding qualified immunity shielded officers from First Amendment claims is an assertion of qualified immunity. *See* R. Doc. No. 7, at 2–3 ("Defendants affirmatively plead qualified immunity and any other applicable immunities and/or limitations of liability as provided for in the Constitution and laws of the United States[.]").

[99] R. Doc. No. 95, at 6.

Court agrees that Reddoch and Hebert are entitled to qualified immunity, it need not reach this merits-based argument. *See Mullenix v. Luna*, 577 U.S. 7, 11 (2015).

This Court has already concluded that, to the extent Holmes argues his arrest and conviction were somehow invalid due to his photography, it is precluded by *Heck* because it requires Holmes to prove "the absence of probable cause" for the arrest. *Roy*, 950 F.3d at 255; *Magee*, 2021 WL 411449, at *5; *McLin v. Ard*, 866 F.3d 682, 696 n.9 (5th Cir. 2017) (requiring First Amendment retaliation plaintiffs to "prove the common-law elements of malicious prosecution," including a finding of no probable cause for the arrest (quoting *Keenan v. Tejeda*, 290 F.3d 252, 260 (5th Cir. 2002))). However, to the extent Holmes's First Amendment claims survive *Heck*, the Court agrees with the defendants that Reddoch and Hebert are entitled to qualified immunity.

To state a constitutional violation based on First Amendment retaliation, Holmes must show "that (1) [he was] engaged in constitutionally protected activity, (2) the defendants' actions caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against [his] exercise of constitutionally protected conduct." *Keenan*, 290 F.3d at 258. "However, a retaliation claim is only applicable 'when non-retaliatory grounds are in fact insufficient to provoke the adverse consequences.'" *Allen v. Cisneros*, 815 F.3d 239, 244 (5th Cir. 2016) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)).

That is, if "[p]robable cause . . . exists, any argument that the arrestee's speech as opposed to her criminal conduct was the motivation for her arrest must fail, no matter how clearly that speech may be protected by the First Amendment." *Mesa v. Prejean*, 543 F.3d 264, 273 (5th Cir. 2008). Hence, "even where a citizen believes that she has been subject to a retaliatory detention or arrest, if there was reasonable suspicion or probable cause for an officer to seize the citizen, 'the objectives of law enforcement take primacy over the citizen's right to avoid retaliation.'" *Cano v. Vickery*, No. 16-392, 2018 WL 4567169, at *6 (S.D. Tex. Sept. 24, 2018) (quoting *Keenan*, 290 F.3d at 261–62).

Applying those principles here, Holmes's arrest cannot be the retaliatory harm, since he "was ultimately arrested for" the outstanding warrants[100]—and not for his speech (or his photography, for that matter). *Alexander v. City of Round Rock*, 854 F.3d 298, 308 (5th Cir. 2017). The Court is well aware that Reddoch's initial investigation was based on Holmes's photography and the suspicious circumstances surrounding it—particularly, the girls' complaints.[101] But that is irrelevant to the validity of the arrest because Holmes's *physical resistance* to Reddoch, and Holmes's outstanding *warrants*, ultimately led to his arrest.[102] Therefore, notwithstanding Holmes's argument relating to his right to photograph the girls, Holmes was arrested for other, valid reasons.

---

[100] R. Doc. No. 72-2, at 8.
[101] *Id.* at 16.
[102] *Id.* at 8.

34

And to the extent Holmes's theory is that Reddoch illegally *detained* him without reasonable suspicion due to Holmes's photography, that theory likewise fails.[103]  Even if Holmes's photography, by itself, was entirely lawful, "a collection of otherwise lawful or innocent behaviors can amount to reasonable suspicion." *United States v. Neufeld-Neufeld*, 338 F.3d 374, 380 (5th Cir. 2003).  The question is whether the "totality of the circumstances" give rise to "a particularized and objective basis for suspecting [Holmes] of criminal activity." *Id.* at 378.  Prior to approaching Holmes, Reddoch knew that several girls spotted Holmes taking pictures of them, a schoolgirl's mother complained to the principal about that, the girls said the photography made them "feel uncomfortable" based on what they learned in a class about strangers, and they specifically identified Holmes.[104]  These facts were sufficient to form a reasonable suspicion particularized to Holmes.  *Id.* at 379 (explaining that reasonable suspicion is "something more than an 'inchoate and unparticularized suspicion or hunch'").  Any reasonable officer in Reddoch's position would therefore have had the requisite suspicion to question Holmes.  Accordingly, this theory of retaliation is not viable for Holmes either.

Moreover, assuming *arguendo* that the foregoing is incorrect and Holmes has stated a constitutional violation, he has failed to show that such violation was clearly established at the time of his arrest.  He relies on *Turner* to argue that "film and photography is clearly protected expression pursuant to the provisions of the First

---

[103] R. Doc. No. 96, at 4.
[104] *See supra* notes 5–11 and accompanying text.

Amendment."[105]  But he ignores that "the Supreme Court has 'repeatedly' instructed courts 'not to define clearly established law at a high level of generality.'"  *Turner*, 848 F.3d at 686 (quoting *al-Kidd*, 563 U.S. at 742).

Accordingly, when one sharpens Holmes's gloss of *Turner*, the case is easily distinguishable.  *Turner* held merely that "the First Amendment protects the right to record *the police* . . . 'engaged in their duties in a public place.'"  *Id.* at 690 (quoting *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011)) (emphasis added).  And it noted that the right "is not without limitations"—*i.e.*, it is "subject to reasonable time, place, and manner restrictions."  *Id.* (quoting *Glik*, 655 F.3d at 84).

Holmes has never alleged that he was photographing police, so his reliance on *Turner* is misplaced.  More importantly, he does not identify a single case extending *Turner* to a fact pattern similar to his.[106]  Without that, he has not met his burden to show that the defendants' conduct violated clearly established law.  *See Durant v. Gretna City*, No. 19-147, 2020 WL 263669, at *25 (E.D. La. Jan. 17, 2020) (Brown, C.J.) (finding no clearly established constitutional violation because the plaintiff's conduct—videotaping the police while detained and handcuffed in the rear seat of a police vehicle—was distinguishable from *Turner*).  Accordingly, Reddoch is entitled

---

[105] Holmes forces the Court to dig through a chain of recursive citations for this argument, and he fails to provide a pincite.  *See id.* at 3 (citing a memorandum delineating his claims, R. Doc. No. 52 (no pincite), for the proposition that "[f]ilm and photography is clearly protected expression pursuant to the provisions of the First Amendment").  That memorandum, in turn, provides the following citation: "*Turner v. Lieutenant Driver*, No. 16-10312 (2017)."  R. Doc. No. 52, at 6.  "Judges are not like pigs, hunting for truffles buried in briefs."  *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

[106] *See* R. Doc. No. 96, at 2–9.

to qualified immunity for Holmes's First Amendment retaliation claim under either the first or second prong.

As for Hebert's alleged "clenched fist": Holmes has not carried his burden to show that Hebert's actions constitute First Amendment retaliation. Holmes offers no record evidence, other than a single conclusory allegation in his own declaration, showing that Hebert's actions were "substantially motivated" by Holmes's "constitutionally protected" speech—a necessary element of the claim. *Keenan*, 290 F.3d at 258. Holmes's declaration says only that Hebert held his fist to Holmes "[i]n response" to Holmes's speech.[107] That, by itself, is not enough to prove that Hebert was "substantially motivated" by Holmes's *speech*, rather than Holmes's prior *conduct* (or even some combination of the two). *See Keith v. Schuh*, No. 97-60540, 1998 WL 611207, at *3 (5th Cir. 1998) (concluding that the plaintiff's "bald and conclusional allegations" did not create a genuine dispute of fact as to whether the officer "intended to retaliate" for the plaintiff's speech); *Singleton v. Darby*, 609 F. App'x 190, 194 (5th Cir. 2015) (concluding the record failed to show the officer "pepper sprayed the protestors for any reason other than to clear the road," and therefore was not retaliatory).

Holmes does not cite facts in the record suggesting Hebert's retaliatory intent.[108] Holmes's only evidence is his declaration, which is insufficient for the reasons stated above. "The [C]ourt has no duty to search the record for material fact

---

[107] R. Doc. No. 72-1, at 3 ¶ 21.
[108] R. Doc. No. 96, at 9.

issues. . . .  Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).  And courts "do not . . . in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *Little*, 37 F.3d at 1075.  "A rational trier of fact might conclude that [Holmes's] allegations [of Hebert's intent] present a scintilla of evidence, but a mere scintilla is not enough to defeat a motion for summary judgment." *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1086 (5th Cir. 1994).

Because Holmes has insufficiently supported his allegation that Hebert was substantially motivated by an intent to retaliate against Holmes's speech, rather than his conduct, Hebert is entitled to qualified immunity on this claim; there simply is no *genuine* factual dispute on that point.  *See Anderson*, 477 U.S. at 248 (explaining a "genuine" dispute exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party").  Moreover, as with many of his other claims, nowhere in Holmes's two-sentence defense[109] of this claim does he cite any case showing that his version of the disputed facts is a clearly established constitutional violation.  Accordingly, Hebert is entitled to qualified immunity under either prong.

## V.    STATE LAW CLAIMS

The Court has concluded that Holmes's federal law claims should be dismissed, so only his state law claims remain.  A district court has "wide discretion" when deciding whether it should retain jurisdiction over state law claims once all federal

---

[109] *Id.*

claims have been eliminated.  *Guzzino v. Felterman*, 191 F.3d 588, 595 (5th Cir. 1999).

However, the general rule in the Fifth Circuit is "to dismiss state claims when the

federal claims to which they are pendent are dismissed."  *Parker & Parsley Petroleum*

*Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992).

A district court may decline to exercise supplemental jurisdiction over a state

law claim if:

> (1)  the claim raises a novel or complex issue of State law,
> (2)  the claim substantially predominates over the claim or claims over
> which the district court has original jurisdiction,
> (3)  the district court has dismissed all claims over which it has original
> jurisdiction, or
> (4)  in exceptional circumstances, there are other compelling reasons for
> declining jurisdiction.

28 U.S.C. § 1367(c).  In addition to these factors, the Fifth Circuit has instructed

district courts to consider the common law factors of "judicial economy, convenience,

fairness, and comity."  *Mendoza v. Murphy*, 532 F.3d 342, 346 (5th Cir. 2008).  "These

interests are to be considered on a case-by-case basis, and no single factor is

dispositive."  *Id.*

These factors weigh in favor of dismissing Holmes's state law claims without

prejudice so that he may assert those claims in state court.  The Court has "dismissed

all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  Moreover,

allowing Louisiana courts to rule on Louisiana law "encourages fairness between the

parties by 'procuring for them a surer-footed reading of applicable law.'"  *Bitte v. EMC*

*Mortgage Corp.*, No. 07-9273, 2009 WL 1950911, at *2 (E.D. La. July 1, 2009) (Africk,

J.) (citations omitted) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715,

726 (1966)).  "[D]eference in this case with respect to the state law issue[s] promotes the important interest of comity to state courts."  *Id.*

Therefore, the Court declines to exercise supplemental jurisdiction over the remaining state law claims.  Those claims are dismissed without prejudice, as ordered below.

## VI.    CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the defendants' motion for summary judgment is **GRANTED**.

**IT IS FURTHER ORDERED** that Holmes's federal law claims barred by *Heck*, as identified above, are **DISMISSED WITH PREJUDICE** to their being asserted again until the *Heck* conditions are met.

**IT IS FURTHER ORDERED** that Holmes's remaining federal law claims, for which the officers are entitled to qualified immunity, as identified above, are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that any remaining claims that were not properly pleaded in Holmes's original complaint or amended complaint are **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that Holmes's state law claims are **DISMISSED WITHOUT PREJUDICE** to their being timely asserted in state court.

**IT IS FURTHER ORDERED** that the defendants' motion[110] to strike medical witnesses and Holmes's motion[111] for leave to file opposition thereto are **DISMISSED AS MOOT**.

New Orleans, Louisiana, March 18, 2021.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

---

[110] R. Doc. No. 70.
[111] R. Doc. No. 83.